UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

BEVERLY WILLIAMS,

        Plaintiff,

                                  Case No. 19-cv-80-pp

    v.

MILWAUKEE BOARD OF SCHOOL DIRECTORS,[1]

        Defendant.

---

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 82) AND DISMISSING CASE

---

On January 14, 2019, the plaintiff filed a complaint against the defendant, her former employer, alleging disability and race-based discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act (ADA). Dkt. No. 1. On July 31, 2024, the defendant filed a motion for summary judgment on all claims. Dkt. No. 82. That motion has been fully briefed since October 2024. Dkt. Nos. 83, 100, 106. The court will grant the defendant's motion and dismiss the case.

---

[1] The plaintiff named "Milwaukee Public Schools" as the defendant. "Milwaukee Public Schools" is not a suable entity. <u>Kleckley v. Milwaukee Pub. Sch.</u>, 20 F. Supp. 2d 1264, 1266 (E.D. Wis. 1998). Consistent with other district courts in this circuit, the court will reconstrue the plaintiff's complaint as having been brought against the Milwaukee Board of School Directors and substitute the proper defendant. See <u>Kuether v. Posley</u>, Case No. 23-CV-948, 2024 WL 3026518, at *2 (E.D. Wis. June 17, 2024); <u>Arrasheed v. Bd. of Educ. City of Chicago</u>, Case No. 19-CV-7614, 2022 WL 17583754, at *1 n.1 (N.D. Ill. Dec. 12, 2022).

Case 2:19-cv-00080-PP   Filed 03/31/25   Page 1 of 39   Document 108

## I. Preliminary Evidentiary Matters

Before reviewing the parties' proposed findings of fact, the court must address the objections raised to those filings. The plaintiff objects to the declarations the defendant filed in support of its motion for summary judgment, arguing that the documents are "unsigned declarations by non-attorneys" and that 28 U.S.C. §1746 and Wis. Stat. §801.18(12)(i) require a handwritten signature, rather than an electronic one. Dkt. No. 99 at 1. The plaintiff is incorrect. "Declarations must be signed under penalty of perjury, but nothing in 28 U.S.C. §1746 requires handwritten signatures," Flakes v. Carr, No. 21-2464, 2022 WL 519909, at *1 (7th Cir. Feb. 22, 2022), and Wisconsin's state statutory requirements for declarations are not applicable in a federal court proceeding. The defendant's declarations are electronically signed under penalty of perjury, which is sufficient. The court will not strike the defendant's proposed facts on this basis.

The defendant objects to the plaintiff's additional proposed findings of fact, arguing that the submission violates Civil Local Rule 56(b)(2)(B)(ii) (E.D. Wis.). Dkt. No. 104 at 1. The defendant argues that the plaintiff has not supported her proposed facts with "specific references to the affidavits, declarations, parts of the record, and other supporting materials relied upon." Id. (quoting Civil L.R. 56 (b)(2)(B)(ii)). The defendant says that the plaintiff often references exhibits attached to an attorney's declaration, but that instead of citing the particular exhibit, the plaintiff refers to Bates numbers or "ERD," requiring the defendant to "wade through a voluminous pile of fourteen

exhibits to [the attorney's] declaration totaling 3,565 pages to determine if a document cited is even present in the record, and if so, where it is." Id. at 2–3. The defendant says that many of the documents the plaintiff cited were produced by the *plaintiff* and which the defendant had provided to the plaintiff in a 2014 case; it says the plaintiff has re-labeled those documents "MPS-WIL," while she has labeled the documents that the defendant produced to her in *this* case "MESD." Id. at 3. The defendant maintains that the result is "a veritable 'Gordian knot' of varying and inconsistent citations to the record that is incredibly difficult to discern." Id. The defendant asks the court to strike the plaintiff's findings of fact in their entirety or, at minimum, to strike those facts that are unsupported by the record as identified by the defendant. Id. at 3.

There *are* several problems with the plaintiff's proposed findings of fact. Nearly all the plaintiff's proposed facts are improperly compound (stating more than a single fact per numbered paragraph), in violation of Civil L.R. 56(b)(2)(B)(ii). And as the defendant has asserted, several of the plaintiff's proposed findings of fact are unsupported. Based on the court's review, several proposed facts cite to documentary evidence that does not support the proposed fact, see, *e.g.*, Dkt. No. 97 at ¶¶2–3, 6–13, 15–16, 20, 28–30, 40, 46, 50–51, 59–61, 66, 69–71, or documentary evidence that was not submitted to the court, see, *e.g.*, id. at ¶¶24, 42, 63, and some contain no citation to evidentiary support at all, see, *e.g.*, id. at ¶¶25, 33, 56, 59, 65, 69–71, 74. The plaintiff made these errors even after the court granted her two extensions of time to respond to the defendant's summary judgment motion; she received

nearly double the amount of time allotted by the Local Rules. The court will not consider any of the numerous proposed facts that are not supported by the record. Civil L.R. 56(b)(2)(B)(ii) (opposing party's additional proposed facts must include "references to the affidavits, declarations, parts of the record, and other supporting materials relied upon to support the facts described in that paragraph"); EEOC v. Chrysler Grp., LLC, Case No. 08-C-1067, 2011 WL 693642, at *5–8 (E.D. Wis. Feb. 17, 2011) (striking proposed facts that are not supported by admissible evidence).

Both parties raise hearsay objections throughout each other's proposed findings of fact. Dkt. Nos. 99 at ¶¶64–65, 89, 96–98, 112, 115; 104[2] at ¶¶18, 21, 26–27, 47, 57, 67, 75. "A party may not rely on inadmissible hearsay to avoid summary judgment." MMG Fin. Corp. v. Midwest Amusements Park, LLC, 630 F.3d 651, 656 (7th Cir. 2011). The plaintiff's objections all relate to documents and statements that the defendant says it considered when making the decision to discipline and terminate the plaintiff. Dkt. No. 99 at ¶¶64–65, 89, 96–98, 112, 115. But such documents and statements are not hearsay because they are not being offered for the truth of the matter asserted. The defendant is offering the documents to show what the defendant considered when making its employment decisions. The defendant has not made an

---

[2] The court will not discuss hearsay objections to any of the plaintiff's statements of fact that it already has deemed unsupported by the evidence for other reasons.

affirmative assertion that the facts contained in the proffered documents are true, so there is no hearsay issue.

The defendant's objections relate to material that the plaintiff *is* offering for the truth of the matter asserted. Dkt. No. 104 at ¶¶18, 21, 26–27, 47, 57, 67, 75. The plaintiff's proposed facts in paragraphs 18, 21, 26–27 and 57 are supported by the plaintiff's emails allegedly recounting events and conversations with other employees, and Paragraph 67 quotes a text message exchange with another employee. Paragraph 75 is deposition testimony from the plaintiff in which she recounted a text message exchange with another employee. Rather than presenting sworn testimony from the plaintiff or these other employees, the plaintiff cites to out-of-court statements in the form of her own emails and repeats what other employees told her to support her assertions. That is improper, and the court will not consider these proposed facts. <u>MMG Fin. Corp.</u>, 630 F.3d at 656 (testimony of one employee repeating what a third party had told them was hearsay that could not be considered on summary judgment).

Paragraph 47 refers to the defendant's position statement submitted in response to the plaintiff's charge of discrimination. "An employer's position statement in an EEOC proceeding may be admissible to the extent it constitutes an admission, or to show the employer has given inconsistent statements in justifying its challenged decision, which may tend to prove that its stated reasons are pretexts." <u>Frazier v. Ind. Dept. of Labor</u>, No. IP01-1098, 2003 WL 21254424, at *5 (S.D. Ind. Mar. 17, 2003). The position statement is

5

admissible, and the court will consider it to the extent that it constitutes an admission or prior inconsistent statement.

## II.    **Factual Background**

The following facts are undisputed unless otherwise noted and contain only those facts that the court has found to be supported by admissible evidence in the record.

### A.    The Plaintiff's Employment with the Defendant

The defendant first hired the plaintiff as a special education teacher in the 1997-98 school year. Dkt. No. 99 at ¶4. The plaintiff began working for Garden Homes Elementary School in the 2010-11 school year. Id. at ¶5. The following school year, Garden Homes transitioned to a Montessori school and was renamed Lloyd Barbee Montessori School. Id. at ¶¶1–2. At the time the parties briefed the motion, Catherine Loss was the principal at Lloyd Barbee and had served as principal since the 2012-13 school year. Id. at ¶3.

The plaintiff asserts that sixty percent of the teachers at Garden Homes were Black, but that after the transition into a Montessori school, about eighty-six percent of the teachers were White. Dkt. No. 104 at ¶¶3–4. More than ninety-five percent of the students at Lloyd Barbee are Black. Id. at ¶5. The plaintiff taught students with disabilities in what MPS calls "Most Restrictive Placement" (MRP). Id. at ¶6.

### B.    The Plaintiff's Disabilities and Request for Accommodation

The plaintiff states that the defendant was aware of her disabilities by September 2013. Id. at ¶19. The plaintiff displayed symptoms of oral

6

mandibular dystonia, a rare focal neurological disorder that affects the mouth, face and jaws and results in a noticeable difficulty speaking. Id.

On December 19, 2013, Loss issued the plaintiff a warning letter about absenteeism. Id. at ¶22. The plaintiff argues that this was improper, because Loss knew that the absences were due to medical reasons related to her disability. Id. The plaintiff says that Loss did not issue warning letters to White teachers with the same number of absences, but the defendant disputes this. Id. at ¶23.

On March 13, 2014, Loss informed Special Education Supervisor Dorothy Waters that the plaintiff was on worker's compensation for an injury. Id. at ¶28. Waters responded "convienient [sic] - what did she do now? if that one boy popped her i hope you looked the other way!" Id. Loss responded that a student had "opened the door into her apparently hard." Id. at ¶29. The plaintiff says that the defendant denied her request for related FMLA leave. Id. at ¶30. On April 16, 2014, the plaintiff complained to the defendant's Office of Human Capital, alleging that the defendant had denied her FMLA request and that she had improperly received a warning letter for medical-related absences in December 2013. Id. at ¶31. The defendant ultimately approved the plaintiff's intermittent FMLA leave request on May 8, 2014. Id. at ¶34.

On June 8, 2014, the plaintiff emailed Loss notifying her that the lower back injury the plaintiff had sustained in January 2014 was being exacerbated by the stair-climbing she had to do because her classroom was located on the third floor of Lloyd Barbee. Dkt. No. 99 at ¶6. The plaintiff requested a

7

classroom change to the first floor or the basement with a change to a classroom on the second floor as a last resort. Id. at ¶7. The next day, Loss forwarded this email to James Gorton, a manager for the Employee Rights Administration Division in the defendant's Office of Human Resources, who was responsible for assisting school staff with reasonable accommodation requests. Id. at ¶¶8–9.

The parties dispute how the defendant came to a decision on the plaintiff's request. According to the defendant, Loss and Gorton spoke regarding the plaintiff's accommodation request and Loss explained to Gorton that moving the plaintiff to a different classroom would cause a hardship and operational difficulties for the school. Id. at ¶¶10–11. According to the plaintiff, Loss already had decided not to accommodate the plaintiff's request. Id. at ¶8. The plaintiff says that Loss wanted to "segregate" her special education students from the rest of the Montessori students. Id. at ¶11. The plaintiff argues that she originally had a second-floor classroom but that when Loss became principal, she transferred all special education students to the plaintiff's class and gave the plaintiff's old room to a White art teacher who used the room two days per week. Id.

On June 9, 2014, Gorton emailed the plaintiff explaining that he had spoken with Loss and notifying the plaintiff of the reasons that a classroom change would cause a hardship and operational difficulty. Id. at ¶12. Gorton also asked the plaintiff to identify the nature and extent of her current limitations because the doctor's statement the defendant had on file stated that

8

her stair restrictions expired on March 21, 2014. Id. Gorton stated that he would investigate the matter further once he received additional medical information, which the plaintiff said she would provide by the end of the week. Id. at ¶13.

On June 16, 2014, the plaintiff emailed Gorton to inform him that her primary doctor was unable to assess her stair climbing limitation and that a specialist would make that assessment during a June 24, 2014 appointment. Id. at ¶14. Gorton responded with the defendant's standard Medical Information Questionnaire that had specific questions regarding stairs; he explained that he would not be able to assess her accommodation needs until he received updated medical information. Id. at ¶15.

That same day, Loss completed a performance evaluation for the plaintiff which contained an overall rating of "unsatisfactory." Dkt. No. 104 at ¶37. The plaintiff immediately complained that the poor rating was discriminatory and advised Loss that she had filed a discrimination complaint against Loss with the EEOC. Id. The plaintiff asserts that Loss evaluated her differently than she evaluated White teachers, but the defendant disputes this. Id. at ¶¶38–40. The defendant then placed the plaintiff on a performance improvement plan beginning in August 2014. Id. at ¶48.

On August 1, 2014, the plaintiff emailed Gorton asking for an update on her classroom assignment and objecting to how Loss had handled the situation, stating that Loss could have resolved the request without Gorton's involvement. Dkt. No. 99 at ¶16. Gorton responded that he could not assess

the plaintiff's accommodation needs without updated medical information and that it was expected of principals to involve him in the accommodations process for staff members. Id. at ¶17.

A week later, the plaintiff emailed Gorton informing him that her doctor's report required her to decrease the amount of stair climbing or move to a classroom on the first or second floor. Id. at ¶18. On August 11, 2014, the plaintiff faxed a copy of her doctor's report to Gorton. Id. at ¶19. Gorton responded that the report did not contain enough information to assess the plaintiff's accommodation needs and again provided the defendant's Medical Information Questionnaire form. Id. at ¶20. The plaintiff responded that her doctor would not be able to complete the defendant's form until after the start of the school year. Id. at ¶21. The plaintiff suggested that she remain in her third-floor classroom and reduce the number of stairs she climbed. Id. Gorton replied that he would discuss the classroom location with Loss again and asked the plaintiff about how she would go about reducing the amount of stair climbing if she remained on the third floor. Id. at ¶22.

Two days later, the plaintiff emailed Gorton stating that she believed that Loss could have handled the accommodation process herself and that Loss had done this "strategically" to push the plaintiff out of Barbee. Id. at ¶23. The plaintiff stated that she could limit her trips up and down the stairs to three per day if she had to stay on the third floor. Id. Gorton then emailed Loss regarding the plaintiff's classroom placement, as well as the option to keep her

10

on the third floor with limitations. Id. at ¶24. Loss responded that she would like to leave the plaintiff on the third floor with limitations. Id.

On August 14, 2014, Gorton informed the plaintiff that she would remain in a third-floor classroom with limitations. Id. at ¶25. Gorton instructed the plaintiff to contact Loss to work out the finer details of the accommodation arrangement and said that the plaintiff should self-regulate her conduct so as not exceed her restrictions. Id. Gorton told the plaintiff to contact him if she had any concerns about the accommodation arrangement. Id. at ¶¶25–26.

Loss and the plaintiff then spoke about her limitations and decided that the plaintiff's Paraprofessional or Children's Health Assistant would be responsible for escorting the plaintiff's students between her classroom and the bus and that the plaintiff should otherwise avoid taking any action that would result in her having to climb the stairs at the building more than three times per day. Id. at ¶27. The plaintiff implies that this was a directive from Loss and that she did not agree with these restrictions. Id.

C.     The Plaintiff's October 2016 Absence

On October 20, 2016, the school secretary informed Loss sometime around 1:00 p.m. that she had called the plaintiff's classroom and learned that the plaintiff had not returned to the classroom following the end of her scheduled lunch break. Id. at ¶42. Loss emailed the plaintiff and informed her that if she was going to be absent from school for any reason during work hours, she needed to request a substitute teacher per school policy. Id. at ¶43. The employee handbook in effect at the time stated that staff members were

11

required to inform the principal in advance of any absences during the school day, including the anticipated departure and return time. Id. at ¶¶44–45. The plaintiff responded that she had scheduled a doctor's appointment over her lunch break which she had had to wait longer than expected for. Id. at ¶46. The defendant contends that the plaintiff did not report her absence to Loss or receive approval from Loss for the absence; the plaintiff argues that the absence was approved because she had intermittent FMLA leave. Id. at ¶47. Because the plaintiff did not request approval from Loss, the plaintiff's 2.8-hour absence that day was charged as an "Absence Without Approved Leave," which is unpaid time. Id. at ¶49.

D.     November 2016 Injury to the Plaintiff's Student

On November 16, 2016, a student in the plaintiff's class sustained a burn on her arm from touching the radiator in the classroom. Id. at ¶51. After the incident, Loss asked the plaintiff to contact the student's mother about the injury. Id. The student's mother then called Loss, explaining that she did not think that it was appropriate for the plaintiff to bring up her daughter's poor behavior as opposed to explaining the injury her daughter sustained. Id. at ¶52. The student's mother also filed a constituent concern with the MPS Office of the Board of Governance regarding the incident. Id.

Loss wrote the plaintiff a counseling letter dated December 16, 2016, outlining the incident and advising the plaintiff that in the future she should be attentive to the concerns of parents and reassure them that the classroom is a safe learning environment. Id. at ¶53. The plaintiff argues that the burn was

12

Loss's fault because she refused to install covers over the radiators to protect students. Id. The defendant says that Loss ordered coverings for the radiators after this incident; the plaintiff states that Loss already was aware of the danger and chose not to do anything until the student was injured. Id. at ¶54.

E.     Student K.F.

During the 2016-17 school year, the plaintiff had a twelve-year-old student, K.F., assigned to her class. Id. at ¶¶55–56. Throughout the year, the plaintiff emailed Loss several times about K.F.'s behavior. Id. at ¶57. In turn, Loss had several conversations with K.F.'s mother to address the behavioral concerns with K.F. Id. at ¶59.

On September 23, 2016, the plaintiff emailed Brenda Fogel, a Special Education Supervisor, requesting that a younger student with whom K.F. often would get into fights be transferred out of the plaintiff's classroom. Id. at ¶60. Fogel informed the plaintiff that there were no other placements available for the student and asked if the plaintiff would like to speak with a support teacher; the plaintiff declined. Id. at ¶¶61–62. Later, Kelly Lockett, a Children's Health Assistant, was assigned to the plaintiff's classroom to provide one-on-one assistance to the younger student. Id. at ¶63.

On January 11, 2017, the plaintiff confiscated K.F.'s cell phone during the school day. Id. at ¶64. The plaintiff asserts that this was because K.F. had been insulting her and using his phone instead of completing his work. Dkt. No. 104 at ¶58. The parties dispute whether the cell phone battery was missing when the plaintiff returned K.F.'s phone at the end of the day. Dkt. No. 99 at

13

¶64. On January 11, 2017, K.F.'s mother filed a constituent complaint with MPS, alleging that the plaintiff had engaged in numerous instances of inappropriate conduct, including mistreatment of students, physical and verbal abuse and taking the battery from K.F.'s cell phone. Id. at ¶65. The plaintiff disputes the accuracy of the complaint and denies taking the battery. Id.

The following day, January 12, 2017, K.F.'s mother came to Lloyd Barbee and went to the plaintiff's classroom with the school's Security Officer to confront the plaintiff about the missing cell phone battery. Id. at ¶66. The plaintiff contends that K.F.'s mother was "physical[ly] threatening and disruptive" and swore at the plaintiff in front of her students before being removed by security. Id. Loss did not observe the interaction, but when she returned to the office, Loss believed K.F.'s mother appeared calm and was cooperative. Id. at ¶67. After speaking with her direct supervisor, Loss decided not to call the police department or sign a no trespass order against K.F.'s mother. Id. at ¶68.

Loss then gathered statements from the paraprofessional assigned to the plaintiff's classroom, Lockett and the school security officer regarding the incident and the missing cell phone battery. Id. at ¶69. The plaintiff sent Loss a statement via email denying taking K.F.'s cell phone battery and stating that she did "not care that K.F.'s mother had filed a complaint with central office" and that she would like K.F. to be "placed in another classroom and his mother not allowed to come to the school." Id. at ¶70 (quoting Dkt. No. 85-8).

14

On January 13, 2017, the plaintiff filed a constituent concern with the MPS Board of Governance regarding K.F.'s mother. Id. at ¶71. On January 24, 2017, Dr. Keith Posley, the Chief School Administration Officer wrote a letter in response to the plaintiff's constituent concern, finding that, after reviewing the constituent concern along with statements from those involved, the situation was handled appropriately because "the safety [sic] quickly responded to the call from the classroom, remained there for the duration of the parent meeting and therefore was in control of the situation." Id. at ¶72 (quoting Dkt. No. 89-4).

After the incident with K.F.'s mother, the parties dispute whether the plaintiff refused to teach K.F. or allow K.F. in her classroom. Id. at ¶73. The defendant states that between January 12, 2017 and January 30, 2017, K.F. was serviced by two other special education teachers and that K.F. also would spend time in the main office when there was no other special education teacher available. Id.

F.    The Plaintiff's Suspension and Disciplinary Hearing

K.F. had an Individual Education Program (IEP) meeting scheduled for January 31, 2017. Id. at ¶74. As K.F.'s assigned teacher and special education case manager, the plaintiff was required to attend K.F.'s IEP meeting. Id. A few days before, the plaintiff emailed Loss stating that she would not attend K.F.'s scheduled IEP meeting. Id. at ¶75. The plaintiff contends that she refused only because the defendant did not have a "safety plan" in place to address the threatening behavior exhibited by K.F.'s mother. Id. Loss forwarded this email

15

to Evangeline Scoptur, the Director of Department of Employment Relations in the Office of Human Resources for MPS. Id.

After Scoptur learned about the plaintiff's conduct to and between several individuals including Loss and others, the decision was made to move forward with an emergency disciplinary proceeding. Id. at ¶78. The defendant contends that the decision was based on the alleged theft of K.F.'s cell phone battery, the plaintiff's refusal to teach K.F. or attend his IEP meeting and her history of unprofessional, insubordinate and combative behavior and communications with other Lloyd Barbee staff members, including Loss, throughout the 2016-17 school year. Id. at ¶85. The plaintiff argues that the disciplinary proceedings were the result of discriminatory animus and in retaliation for opposing discrimination. Id.

On January 30, 2017, the defendant informed the plaintiff via letter that she was suspended with pay pending a disciplinary hearing to take place on February 1, 2017. Id. at ¶86. Scoptur worked with Loss to compile the documentation and information necessary to back up allegations of the plaintiff's conduct that supported disciplinary action. Id. at ¶88. The documentation included (1) a statement from Loss stating that K.F. was serviced by special education teachers Marianna Waller or Laura Kreuzer from January 12, 2017 through January 30, 2017 and spent time in the office when there was no teacher available; (2) the plaintiff's January 12, 2017 statement regarding the incident with K.F.'s mother; (3) a January 31, 2017 statement from Kim Novak (Lloyd Barbee school's special education supervisor) detailing

16

the plaintiff's refusal to attend K.F.'s IEP meeting; (4) K.F.'s mother's January 11, 2017 constituent complaint; (5) the statements from Lockett, Kenneth Hayes[3] (the paraprofessional assigned to the plaintiff's classroom) and school security officer Donovan Cotton that Loss collected; (6) documentation relating to the missing cell phone battery and a replacement cost; and (7) a January 31, 2017 statement from Loss detailing the facts of the incident with K.F.'s mother and the plaintiff's insubordination throughout the 2016-17 school year supported with email examples. Id. at ¶89. The plaintiff was represented by Bonnie Brusky, a union representative. Id. at ¶87.

G.    The Plaintiff's Transfer to Maple Tree School

After the hearing, Scoptur spoke to Brusky and suggested that the plaintiff transfer schools as an alternative to formal discipline. Id. at ¶¶90–91. On February 2, 2017, Brusky informed Scoptur that the plaintiff would agree to transfer to Maple Tree School the following Monday. Id. at ¶92. Scoptur arranged for the plaintiff to collect her belongings from Lloyd Barbee that afternoon after attending professional development programming in the morning at Maple Tree. Id. at ¶94.

The plaintiff arrived at Lloyd Barbee around 2:00 p.m. on February 6, 2017 to pack up her belongings. Id. at ¶95. Curtis Smith, a substitute teacher, had been teaching the plaintiff's former students in the plaintiff's former classroom and was preparing the classroom for the next day. Id. at ¶96. Smith

---

[3] The parties sometimes spell this surname "Hays" and sometimes spell it "Hayes."

had written lesson plans for the week on the chalkboard and prepared worksheets for the students for the week with bookmarks for the specific units the students were working in. Id. When the plaintiff arrived, Smith left the classroom. Id. Smith briefly returned to the classroom around 2:30 p.m. and noted that all the lesson plans that he had written on the board had been erased. Id. at ¶97. He also observed the plaintiff taking things off the wall and bagging things up. Id. The school secretary, Alice Doyle, stopped in the classroom at 4:35 p.m. to see if the plaintiff needed any assistance and noted that the room "had several items on the floor as if [the plaintiff] was just dropping things as she go" and was a "complete mess." Id. at ¶98. The plaintiff disputes this, arguing that she spoke to Doyle and that Doyle denied telling Loss that the room was a "complete mess." Id.

As Loss was preparing to leave the building around 6:00 p.m. that day, a building service helper informed her that someone was still in the building. Id. at ¶99. According to the defendant, Loss went to the third floor of the building and noticed a big pile of black MPS trash bags in the hallway and that everything had been removed from the tack boards in the hallway outside the plaintiff's room, including student work that had been displayed on those tack boards. Id. at ¶100. The defendant says that when Loss walked into the classroom, she also saw that all the backing paper, student work, posters and other materials had been taken off the bulletin boards in the classroom and that the chalkboard had been completely erased. Id. at ¶102. The plaintiff

18

disputes Loss's testimony, arguing that Loss has prepared "false statements" about the incident. Id. at ¶¶100–102.

After the plaintiff left the building around 6:30 p.m., Loss returned to the classroom with the building service helpers to clean up the room to make it ready for the students the following day. Id. at ¶¶103–104. The defendant says the classroom still was not in a presentable state the next day, so Loss asked Smith to use a different classroom for the day. Id. at ¶106. The plaintiff disputes this, stating that the custodians testified that the room was clean when they left. Id. Loss also observed that several items were missing from the plaintiff's former classroom, including metal baskets containing student work portfolios, a pencil sharpener and three books that were the property of MPS. Id. at ¶¶107–108.

H.    The Plaintiff's Termination

Loss informed Scoptur that the plaintiff had left the classroom in disarray and that students' work had been thrown out. Id. at ¶109. Scoptur initiated emergency disciplinary proceedings against the plaintiff. Id. at ¶110. The disciplinary hearing took place on February 13, 2017. Id. at ¶112. At the hearing, Saveon Grennel, an employment relations specialist, presented a packet of documentation on behalf of MPS containing: (a) seven witness statements attesting to the state of disarray of the classroom after the plaintiff moved her belongings out on February 6, 2017, the destruction of student work and the theft of MPS property in the form of three textbooks and a pencil sharpener; (b) copies of the photographs of the classroom that Loss had taken;

19

(c) copies of the administrative policies that the plaintiff was alleged to have violated; (d) a copy of the plaintiff's acknowledgement of receipt of those policies; and (e) a copy of a prior disciplinary letter. Id.

Scoptur went to Lloyd Barbee the day after the hearing to see if she could locate the missing student work. Id. at ¶114. Scoptur spoke to the school engineer, who informed her that she had witnessed the plaintiff removing student work from the walls. Id. at ¶115. Scoptur spoke with Smith and Lockett, each of whom indicated that not only was the student work that originally was on the bulletin boards, the walls and outside the room gone, but that five of seven students' work portfolios, which contained their work for the entire school year, were gone. Id. at ¶116.

The defendant says that Scopter made the decision to terminate the plaintiff's employment based on the documentation and information presented at the February 13, 2017 hearing and her trip to Lloyd Barbee on February 14, 2017. Id. at ¶117. The plaintiff contends that the decision to terminate her was a foregone conclusion. Id. The plaintiff was terminated effective February 15, 2017. Id. at ¶119.

The plaintiff appealed her termination per the defendant's grievance policy. Id. at ¶120. Her Step One and Step Two grievances were denied, and the Milwaukee Board of School Directors sustained that decision on appeal. Id. at ¶¶121–127. The plaintiff also applied for and ultimately was denied unemployment benefits with the Wisconsin Department of Workforce Development, because it was determined that she was discharged for

20

misconduct. Id. at ¶¶128–129. The Wisconsin Labor and Industry Review Commission upheld the decision on review. Id. at ¶130.

I.  The 2014 Discrimination Charge and 2020 Settlement Agreement

On June 20, 2014, the plaintiff filed a charge of discrimination with the EEOC and the Wisconsin Department of Workforce Development regarding the defendant's purported failure to accommodate the plaintiff's disability by refusing to place her in a classroom on a lower floor. Dkt. No. 99 at ¶¶32–34. On November 3, 2016, the plaintiff amended her charge to add allegations that the defendant had docked her pay for missing time from work for a doctor's appointment on October 20, 2016 and in retaliation for filing her 2014 charge. Id. at ¶35. On January 31, 2017, the plaintiff amended her charge again, alleging retaliation for filing her 2014 charge based on her January 30, 2017 suspension arising out of her failure to provide required educational services to K.F. and the defendant's alleged failure to protect the plaintiff when K.F.'s mother allegedly entered plaintiff's classroom to confront her on January 12, 2017. Id. at ¶36.

On December 28, 2020, the parties entered into a settlement and release agreement for the claims raised in the 2014 charge. Id. at ¶37. The plaintiff was represented by counsel. Id. at ¶38. The plaintiff expressly agreed to

> release and forever discharge [Defendant] of and from any and all manner of action or actions, cause or causes of action . . . whatsoever in law or equity, which she has had or now has against [Defendant] . . . whether based on . . . any federal, state or local law, statute or regulation, specifically including, but not limited to any and all claims under . . . the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12101, *et seq.*;  . . . Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*; . . .

21

including, but not limited to, any claims which have arisen or could arise out of or are connected with the Board as named or referred to in [plaintiff's] State of Wisconsin, Department of Workforce Development, Equal Rights Division, charge no. CR201402535, and any amendment to those charges.

Id. at ¶39 (quoting Dkt. No. 89-1 at 141–42). The plaintiff acknowledged that the agreement was intended to release all claims—known or suspected—that existed at the time of the execution of the agreement arising out of her employment with the defendant. Id. at ¶40 (quoting Dkt. No. 89-1 at 145). In Section 2, the agreement states:

The parties agree that this Agreement does not apply to the claims or defenses in the matter pending in the Eastern District of Wisconsin, *[The Plaintiff] v. Milwaukee Public Schools*, Case No. 19-CV-80, except that [the plaintiff] acknowledges that any claims asserted in the underlying complaint in Equal Rights Division, Case No. CR201402535, cross-filed with the EEOC as Case No. 443-2014-00970 (dismissed and right to sue letter issued November 20, 2014), that may be asserted in Case No. 19-CV-80 are released by this Agreement. The Board specifically acknowledges that the underlying termination claims in *[The Plaintiff] v. Milwaukee Public Schools*, Case No. 19-CV-80, are preserved and unaffected by this Agreement.

Id. at ¶41 (quoting Dkt. No. 89-1 at 142–43).

On April 4, 2017, the plaintiff filed a second charge of discrimination with the EEOC alleging race and disability discrimination relating to her termination and several other alleged employment actions. Dkt. No. 6 at ¶6. On October 17, 2018, the EEOC issued a right to sue letter for that charge, dkt. no. 6-4, and the plaintiff timely filed her federal complaint eighty-nine days later, on January 14, 2019, dkt. no. 1.

### III. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a). "Material facts" are those that, under the applicable substantive law, "might affect the outcome of the suit." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A moving party "is 'entitled to a judgment as a matter of law'" when "the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Still,

> a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

Id. (internal quotation marks omitted).

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. See Heft v. Moore, 351 F.3d 278, 282 (7th Cir. 2003) (citing Liberty Lobby, 477 U.S. at 255). "However, [the court's] favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." Fitzgerald v. Santoro, 707 F.3d 725, 730 (7th Cir. 2013) (quoting

23

Harper v. C.R. Eng., Inc., 687 F.3d 297, 306 (7th Cir. 2012)). That is, "to survive summary judgment, the non-moving party must establish some genuine issue for trial 'such that a reasonable jury could return a verdict' in her favor." Fitzgerald, 707 F.3d at 730 (quoting Makowski v. SmithAmundsen LLC, 662 F.3d 818, 822 (7th Cir. 2011)).

## IV.     Motion for Summary Judgment

The defendant seeks summary judgment on all claims. Dkt. No. 82. The defendant argues that (1) the statute of limitations bars the claims that accrued prior to June 8, 2016; (2) the defendant did not violate the ADA by refusing to move the plaintiff to a classroom on a lower floor; (3) the plaintiff released several of her claims; and (4) the plaintiff cannot establish that she was terminated due to her race or disability or that she was retaliated against for filing a complaint with the EEOC. Dkt. No. 83 at 2.

### A.     Statute of Limitation and Failure to Accommodate Claim

The defendant begins by arguing that both the ADA and Title VII require a plaintiff to file a charge of discrimination within 300 days of the wrongful act and that the plaintiff failed to meet that deadline. Dkt. No. 83 at 14. The defendant asserts that the plaintiff's failure-to-accommodate claim related to her classroom location accrued on August 14, 2014, when she was told she would remain in her third-floor classroom. Id. The defendant says that the plaintiff did not file a charge with the EEOC until April 4, 2017, well over 300 days after the claim accrued. Id. The defendant argues that claims for any

24

adverse employment action that took place before June 8, 2016 are time-barred. Id. at 14–15.

The plaintiff did not specifically respond to this argument in her opposition brief; at most, in the section of her opposition brief arguing that she has alleged a *prima facie* case of discrimination based on race/disability/protected activity, the plaintiff states that she engaged in protected activity "throughout her employment, consistently, from September 2013 and lasting through her February 2017 termination." Dkt. No. 103 at 20. Viewed generously, this *could* imply a version of a continuing violation claim. But the plaintiff also says that she "will not litigate her failure to accommodate claim." Id. at 19 n.2. The defendant argues that the plaintiff's failure to substantively respond to the statute of limitation argument constitutes waiver. Dkt. No. 106 at 3. The defendant maintains that there was a two-year gap in time between the alleged failure to accommodate in August 2014 and the next alleged adverse employment actions during the 2016-17 school year, rebutting any implied continuing violation argument. Id. at 3–4.

The plaintiff appears to have abandoned her failure-to-accommodate claim, as well as all adverse actions alleged in her complaint except her termination in 2017. See Dkt. No. 103 at 19 n.2, 21. The plaintiff asserts that she discusses the other actions because they establish that the "overall environment" in which she worked was hostile. Id. at 21–22 (quoting Hizer v. S. Bend Trib., 31 F. Supp. 3d 986, 1000 (N.D. Ind. 2014)). The court will discuss whether that argument holds water when it addresses the plaintiff's

25

discrimination and retaliation claims. But because the plaintiff is not pursuing a claim based on any adverse actions prior to her February 2017 termination, the defendant's statute of limitation argument is moot, as are its arguments relating to the plaintiff's failure-to-accommodate claim.

The court will grant summary judgment in favor of the defendant on the plaintiff's first claim for relief.

B.     Release Agreement

The defendant next argues that the plaintiff released several of her claims when she signed a settlement and release agreement with the defendant in December 2020. Dkt. No. 83 at 16. The defendant says that the December 2020 settlement releases all claims contained in the plaintiff's 2014 charge of discrimination (as opposed to those contained in her 2017 charge of discrimination). Id. at 17. The defendant concedes that the release agreement carved out the plaintiff's termination-related claims. Id. But the defendant argues that the plaintiff cannot raise any claims arising out of (1) the defendant's alleged failure to accommodate her request to move classrooms; (2) the defendant's failure to pay the plaintiff for her October 2016 absence; (3) the defendant's failure to protect the plaintiff from K.F.'s mother; (4) discipline based on the plaintiff allegedly stealing K.F.'s phone battery; and (5) discipline relating to the plaintiff's refusal to teach K.F. Id. at 17–18. The defendant argues that when the plaintiff released claims related to the 2014 charge, that release also encompassed any claims of retaliation based on the filing of that charge. Id. at 18.

26

The plaintiff did not respond to *this* argument in her opposition brief. She referenced the settlement agreement in a footnote and asserts that the instances of allegedly discriminatory conduct other than her termination can establish evidence of animus toward her disability. Dkt. No. 103 at 19 n.2. The plaintiff does not respond to the argument that she released her retaliation claims yet appears to pursue them based on the arguments in her brief.

The language of the settlement and release agreement is clear. The plaintiff released "any claims asserted" in her 2014 charge of discrimination except those relating to her termination. Dkt. No. 89-1 at 142–43. The plaintiff is barred from asserting claims arising out of the allegedly adverse actions that the defendant identified because those actions were encompassed in the plaintiff's 2014 charge and its amendments. Nor can the filing of the 2014 charge be the basis of a retaliation claim. The plaintiff can (and does) assert that other, possibly protected activity caused the defendant to retaliate against her; the court will address those arguments later in this order. To the extent the plaintiff asserts any claims based on the activity described in her 2014 charge, she cannot proceed on those claims.

The court will grant summary judgment for the defendant on the plaintiff's third and fifth claims for relief because those rely solely on the purportedly adverse actions alleged in the 2014 charge.

C.    Termination and Retaliation Claims

1.    *The Parties' Arguments*

The defendant argues that the plaintiff has not presented sufficient evidence of discrimination to defeat summary judgment on the disparate treatment claims arising out of her termination. Dkt. No. 83 at 18. It contends that the plaintiff was not meeting its legitimate expectations at the time she was fired because she "routinely engaged in antagonistic, unprofessional, and insubordinate behavior." Id. at 19–20. The defendant maintains that those issues were exacerbated by the incidents with K.F.'s cell phone and K.F.'s mother, as well as the plaintiff's unexcused absence in October 2016 and the injury a student sustained in her classroom in January 2017. Id. at 20. The defendant asserts that the plaintiff has not identified a similarly situated employee outside of her protected class who engaged in similar misconduct and was not fired. Id. at 22. The defendant argues that the plaintiff's "passing references" to White or non-disabled employees is not sufficiently specific enough to defeat summary judgment. Id. at 23.

The defendant argues that even if the plaintiff had established a *prima facie* case of discrimination, the plaintiff cannot show that its reasons for terminating her were pretextual. Id. The defendant contends that the plaintiff can establish pretext only by showing that the defendant's stated reason is "a lie," not by arguing about whether the reason "is accurate or fair." Id. at 23–24 (quoting Widmar v. Sun Chem. Corp., 772 F.3d 457, 464 (7th Cir. 2014); Zayas v. Rockford Mem'l Hosp., 740 F.3d 1154, 1158–59 (7th Cir. 2014)). The

28

defendant contends that the plaintiff has not raised a question of fact regarding whether the defendant's stated reasons for terminating her were not the true reason for her termination or that those stated reasons were pretexts for discrimination. Id. at 24. The defendant argues that it conducted a thorough review of the facts and evidence leading up to the plaintiff's termination and found that the plaintiff had destroyed her old classroom—including student work on display, the work their new teacher had prepared for them and, for five of the children, all their work for the year. Id. at 27–28. The defendant states that it found that the plaintiff's behavior was "vengeful, retaliatory, and malicious" and that she had taken over $300 of MPS property. Id. at 28. The defendant argues that it was for all these reasons that it terminated the plaintiff. Id. The defendant says that the plaintiff's termination was upheld throughout the three-step grievance process, emphasizing the legitimacy of the defendant's reasoning. Id. at 28–29.

For similar reasons, the defendant argues that the plaintiff's retaliation claim must fail. Id. at 29. The defendant contends that the plaintiff cannot establish that she was terminated because of any protected activity because she filed her 2014 complaint with the EEOC almost three years before her termination, disrupting any inference of causation. Id. at 29–30. And as it argued regarding the plaintiff's discrimination claims, the defendant says that the plaintiff cannot establish that the defendant's stated reasons for terminating her were false or were a pretext for retaliation. Id. at 30.

The plaintiff responds, somewhat confusingly, that she is alleging "harassment and discriminatory discharge based on three protected characteristics: race, disability, and protected activity (retaliation)." Dkt. No. 103 at 19. She then discusses all three claims together. She argues that she has established a *prima facie* case of discrimination. Id. The plaintiff says that she engaged in protected activity under Title VII and the ADA from September 2013 through her termination in February 2017. Id. at 20. She asserts that she "frequently objected" to Loss's discriminatory treatment and discipline, which she says caused Loss to take more adverse actions against her. Id. She asserts that Loss harbored animus toward her protected classes as evidenced by Loss's treatment of those outside the plaintiff's protected class. Id. at 20–21. The plaintiff asserts that Loss did not fire a White teacher for leaving her old classroom in a messy condition; gave a White, non-disabled art teacher the classroom the plaintiff had requested; failed to reprimand White teachers who were late or tardy to meetings; evaluated White teachers differently than her; assigned the plaintiff more students in her class than White teachers; and disciplined the plaintiff for absences caused by the plaintiff's disabilities. Id. at 21. The plaintiff argues that a reasonable jury might discount Loss's "version of events" leading up to the plaintiff's termination and might find that the plaintiff was meeting the defendant's legitimate expectations. Id.

The plaintiff raises a harassment and hostile work environment claim, arguing that the court must consider the defendant's actions "as a whole" and must find that the defendant's behavior constitutes actionable harassment. Id.

30

at 22. The plaintiff asserts that Loss "harassed, targeted, scrutinized, and nitpicked" the plaintiff and treated her like an "outcast." Id. at 23. She contends that Loss encouraged and allowed threats of physical violence against the plaintiff when Loss informed K.F.'s mother that the plaintiff was responsible for stealing K.F.'s cell phone battery. Id. at 24. The plaintiff says that the harassment culminated in Loss manufacturing false allegations of theft and property damage to terminate the plaintiff. Id.

The plaintiff asserts that the defendant's stated reasons for terminating her are pretextual and not legitimate. Id. at 25. She argues that the defendant did not follow its own policies by instituting emergency disciplinary proceedings against her on February 6, 2017. Id. She contends that the court should not accept any statements by Loss or drafted by Loss because they all are false. Id. She argues that there is a genuine dispute over whether the plaintiff engaged in any misconduct on February 6, because Loss pressured the custodians present that evening into signing false statements that she drafted. Id. at 25–26. The plaintiff says that Loss advocated for the plaintiff's termination through multiple "bad faith schemes" and communicated with MPS officials to encourage adverse actions against the plaintiff. Id. at 26. She argues that Loss perceived her as an "angry black woman" and framed her for conduct accordingly. Id. at 27. The plaintiff maintains that Loss exhibited a pattern of pushing out other Black educators, suggesting discriminatory animus toward the plaintiff's race. Id. at 29. She also argues that Loss used "Montessori instruction" as a proxy to discriminate and retaliate against her and other

31

Black employees. Id. at 29–30. The plaintiff contends that a reasonable jury could find that the defendant "viewed her as an undesirable adversary and obstacle to its Montessori vision because she is Black, disabled, and raised protected complaints." Id. at 30.

The defendant replies that the plaintiff cannot raise a hostile work environment claim at this stage because she did not plead one in her complaint. Dkt. No. 106 at 1. It argues that activity described in her 2014 charge cannot form the basis of a hostile work environment claim because she released claims based on that conduct and did not raise those claims in her subsequent 2017 charge of discrimination. Id. at 4–5. Addressing the merits of the claim, the defendant says that the plaintiff relies on generalizations and does not provide evidence of specific harassment other than her own self-serving statements. Id. at 5–6. The defendant argues that the plaintiff has not presented any evidence tying the allegedly discriminatory activity to the plaintiff's race or disability status. Id. at 7. The defendant argues that even accepting the allegations of allegedly discriminatory activity in 2013-14, those events are not close enough in time to support discriminatory or retaliatory intent underlying the plaintiff's 2017 termination. Id. at 11. The defendant asserts that the plaintiff's allegations that Loss fabricated witness statements to induce the plaintiff's termination are immaterial to the pretext analysis because the plaintiff has not presented any evidence that this claimed conduct was due to discriminatory animus. Id. at 12–13.

32

2. *Analysis*

The plaintiff did not allege a harassment or hostile work environment claim in either her original or her amended complaint, and she cannot assert such a claim years later through an opposition brief to a motion for summary judgment. Although a district court has discretion to allow a plaintiff to amend her pleadings on summary judgment, it would "rarely be appropriate to do so," especially where, as here, the attempted amendment amounts to bringing an entirely new claim rather than raising a new legal theory related to an existing claim. Schmees v. HC1.COM, Inc., 77 F.4th 483, 489–90 (7th Cir. 2023). A disparate treatment claim and a hostile work environment claim have different frameworks of proof. A disparate treatment claim (which the plaintiff has pled) requires the plaintiff to prove by a preponderance of the evidence that her race or disability was the "but-for cause of the challenged adverse employment action." Marnocha v. St. Vincent Hosp. and Health Care Center, Inc., 986 F.3d 711, 718 (7th Cir. 2021) (quoting Skiba v. Ill. Cent. R.R. Co., 884 F.3d 708, 719 (2018)). She may do so by "introducing direct or circumstantial evidence that her employer took an adverse action against her because of" her protected class or "by invoking the burden-shifting framework set forth in *McDonnell Douglas Corp v. Green*, 411 U.S. 792 . . . (1973)." Id. (citation omitted). In contrast, to prove a hostile work environment claim,

> [a] plaintiff must demonstrate that (1) she was subject to unwelcome harassment; (2) the harassment was based on disability or age or another protected category; (3) the harassment was sufficiently severe or pervasive, both subjectively and objectively, so as to alter the conditions of her employment and create a hostile or abusive atmosphere; and (4) there is a basis for employer liability.

33

Brooks v. Avancez, 39 F.4th 424, 441 (7th Cir. 2022) (citations omitted).

The defendant has moved for summary judgment on the claim the plaintiff pled—the disparate treatment claim. It would be prejudicial to allow the plaintiff to raise a new claim at this late stage in the proceedings—one that has different elements, requires different proof and has not been administratively exhausted. The court will not construe the plaintiff's opposition brief as a request for leave to amend her complaint because she did not raise allegations of a hostile work environment in her 2017 EEOC charge or in either of her complaints in this lawsuit. See Bredemeier v. McDonough, Case No. 21 CV 6216, 2024 WL 1050236, at *12 (N.D. Ill. Mar. 11, 2024) (declining to allow amendment via brief where the plaintiff "offers no explanation as to how [the allegations] could be considered timely without amending her complaint, and does not clarify how claims arising from these incidents [after the complaint was filed] would be timely exhausted" by her prior EEOC charges).

Turning to the discrimination and retaliation claims the plaintiff *did* plead in her amended complaint, the court will grant summary judgment in favor of the defendant. At the summary judgment stage, a plaintiff making a Title VII or ADA claim may choose to utilize the McDonnell Douglas burden-shifting framework. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–04 (1973). Under that framework, the plaintiff must establish that she (1) belonged to a protected class; (2) met her employer's legitimate expectations; (3) suffered an adverse employment action; and (4) similarly situated employees who were

34

not members of her protected class were treated better. <u>David v. Bd. of Trs. of Cmty. Coll. Dist. No. 50</u>, 846 F.3d 216, 225 (7th Cir. 2017). If the plaintiff satisfies that preliminary burden, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. <u>Id.</u> If the employer does so, the burden shifts back to the plaintiff to show that the employer's explanation is pretextual. <u>Id.</u>

Alternatively, a plaintiff can take a holistic approach and support her discrimination claim with "direct or circumstantial evidence that supports an inference of intentional discrimination." <u>Joll v. Valparaiso Cmty. Schs.</u>, 953 F.3d 923, 929 (7th Cir. 2020) (quotation omitted). Under this approach, the court "ask[s] whether the totality of the evidence shows discrimination." <u>Igasaki v. Ill. Dep't of Fin. & Pro. Regul.</u>, 988 F.3d 948, 958–59 (7th Cir. 2021) (citing <u>Ortiz v. Warner Enter., Inc.</u>, 834 F.3d 760, 765 (7th Cir. 2016)). "Evidence must be considered as a whole, rather than asking whether a particular piece of evidence proves the case by itself." <u>Ortiz</u>, 834 F.3d at 765. In this case, both the plaintiff and defendant have used the <u>McDonnell Douglas</u> framework.

The plaintiff vigorously disputes the defendant's allegations that she destroyed her classroom on February 6, 2017. But the plaintiff cannot defeat summary judgment simply by disputing the defendant's findings. <u>Kariotis v. Navistar Int'l Transp. Corp.</u>, 131 F.3d 672, 677 (7th Cir. 1997). Even if the defendant's investigation into the plaintiff's alleged misconduct was faulty (and the court is not making a finding on that either way), the defendant's "investigation was the reason given for the discharge, and 'a reason honestly

35

described but poorly founded is not a pretext.'" Id. (quoting Pollard v. Rea Magnet Wire Co., Inc., 824 F.2d 557, 559 (7th Cir. 1987)). The plaintiff was required to present *evidence* that the factual findings at her disciplinary hearing were not the true reason why the defendant terminated her. Brill v. Lante Corp., 119 F.3d 1266, 1273 (7th Cir. 1997) (accuracy of employer's investigation is not relevant to pretext). The plaintiff did not do so; she disputed only the factual basis of the investigation, but did not present evidence showing that the defendant did not genuinely believe that the plaintiff had engaged in misconduct. Al aka-Muhammad v. Marion Cnty. Juv. Det. Ctr., Case No. 15-cv-01495, 2017 WL 6055508, at *9 (S.D. Ind. Dec. 7, 2017) (quoting McClendon v. Ind. Sugars, Inc., 108 F.3d 789, 799 (7th Cir. 1997)) ("[I]t is not relevant whether [the employee] actually was insubordinate [or otherwise violated her employer's policies]. All that is relevant is whether [her] employer was justified in coming to that conclusion." (alterations in original)). As the Seventh Circuit has colorfully put it, "[s]ummary judgment is the 'put up or shut up' time in litigation." Brown v. CACH, LLC, 94 F.4th 665, 667 (7th Cir. 2024). The plaintiff needed to present evidence showing that the defendant's reason for terminating her was false, not that the reason was ill-considered or unreliable. She has failed to do so.

Even if the accuracy of the investigation were at issue, the plaintiff's arguments on that front rely on her unsupported assertions that Loss harbored discriminatory animus toward her and manufactured evidence to justify her termination—assertions that are speculative and are not founded in record

36

evidence. "[I]nferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." Weaver v. Speedway, LLC, 28 F.4th 816, 820 (7th Cir. 2022) (quoting Carmody v. Bd. of Trs. of Univ. of Ill., 893 F.3d 397, 401 (7th Cir. 2018)). The plaintiff has not presented evidence casting doubt on the defendant's stated reasons for terminating her.

Because the plaintiff has not presented evidence that the defendant's stated reason for terminating her was pretextual, the court will grant summary judgment for the defendant on the plaintiff's discriminatory termination claims.

The plaintiff's retaliation claims fail for similar reasons. Title VII prohibits an employer from retaliating against an employee "because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." Igasaki, 988 F.3d at 959 (quoting 42 U.S.C. § 2000e-3(a)). To defeat summary judgment, the plaintiff must present evidence that "(1) [s]he engaged in an activity protected by the statute; (2) [s]he suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action." Lewis v. Wilkie, 909 F.3d 858, 866 (7th Cir. 2018). The plaintiff must offer evidence that a retaliatory motive was a "but-for cause of the challenged employment action." Gracia v. SigmaTron Int'l, Inc., 842 F.3d 1010, 1019 (7th Cir. 2016) (quoting Univ. of Tex. Sw Med. Ctr v. Nassar, 570 U.S. 338, 352 (2013)). "'[R]etaliatory motive may be established through circumstantial evidence such as suspicious timing, ambiguous statements, evidence that the stated reason for the employment decision is

pretextual and' other evidence from which an inference of discriminatory intent might be drawn." Id.

The plaintiff engaged in protected activity by filing a charge with the EEOC in 2014, but she was not terminated until 2017. A three-year gap in time defeats any inference of retaliation based on suspicious timing. Tomanovich v. City of Indianapolis, 457 F.3d 656, 665 (7th Cir. 2006) (four-month gap between protected activity and adverse action was too long to raise an inference of causation). Assuming for the sake of argument that the plaintiff had lodged complaints of discrimination shortly before her termination (though she has presented no evidence that she did), the defendant had a legitimate, non-discriminatory reason to terminate her and, for the reasons discussed above, she has not shown that that reason is pretextual. Nor has the plaintiff presented evidence that there were similarly situated employees who did not engage in protected activity who were treated more favorably than the plaintiff. Although the plaintiff has argued (unsupported by record evidence) that the defendant treated White and non-disabled teachers differently, she has not alleged (much less proven) that those individuals were similarly situated to her or that the defendant treated them differently even though they engaged in protected activity. Because the plaintiff has failed to present any evidence of a causal connection between her alleged protected activity and her termination, her retaliation claims must fail.

The court will grant summary judgment for the defendant on the plaintiff's remaining causes of action and dismiss the case in its entirety.

38

## V. Conclusion

The court **DIRECTS** the Clerk of Court to update the caption to reflect that the Milwaukee Board of School Directors is the correct defendant.

The court **GRANTS** the defendant's motion for summary judgment. Dkt. No. 82.

The court **ORDERS** that this case is **DISMISSED WITH PREJUDICE**. The clerk will enter judgment accordingly.

Dated in Milwaukee, Wisconsin this 31st day of March, 2025.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**